The next case is number 2012-1270. Hoffmann-La Roche v. Genentech v. Apotex, Inc. and others. Mr. Whitehouse. Thank you, Your Honor, and may it please the Court, Roche appeals from denial of a preliminary injunction motion in which the district court reached one issue, likelihood of success on the merits, and found its patent would likely be held invalid at trial. We focused on a number of legal errors in the district court's opinion that we believe required a cater and remand, particularly under several of this court's recent precedents requiring that the district court consider any objective evidence of non-obviousness whenever offered in a case. As you indicated, we're not deciding the validity of the patent. We're talking about the likelihood of success in showing validity. There are references all over the place to once-a-month dosage of this compound, 150 mg per month, 5 mg per day, 35 mg per week. Why isn't it clear that there's no likelihood of success, or at least it hasn't been shown? Okay. Well, we have to look at, of course, the district court's opinion and what the district court concluded based on a review of that evidence. The district court considered two references that disclosed clinical trial results with Roche's drug, Abandronate. Those are the Rabin and Reese references, and those were references that only experts testified one would have relied on as a starting point in the normal course of trying to develop Roche's invention. What the district court overlooked was that prior to Roche's filing date, there was actually a failed clinical trial with Roche's drug, which called into question whether or not dosing intervals could actually be extended out to once a month. The particular issue in this case is heightened by the fact that Roche did not just claim monthly dosing with an effective dose of drug. Roche claimed a specific dose of the drug, 150 mg, and I'd like to focus my argument on why that particular dose would not have been obvious to a person skilled in the art under the appropriate legal standard. Can I back up, though? I just want to understand exactly what it is you think the trial judge did wrong. First of all, you're not objecting to the standard that was applied as it relates to PI. He's pretty loyal to Titan Tire, and he walks through with that, so there's no issue there, correct? That's correct. In your brief, you argued that he placed undue focus on an obvious trial analysis, and we can get to that in a minute. Are you now adding something else to that in terms of what you think is a legal error that he engaged in? Yes, Your Honor. Two specific legal errors, and the one that I'd like to focus on, I think, a main legal error, is that the district court at page 15 of its opinion said that plaintiffs had failed to point out what it was that the inventors had invented. What was the contribution here? What was the big deal about the 150 mg dose? The district court acknowledged that there had been an argument that it would have been unexpected that that dose would have been safe and effective. We can get into that. The legal error was that the district court overlooked the evidence presented by Roche of unexpected superiority of that dose. The reason that the superiority would have been unexpected is because the clinical trial papers published before the filing date established, and the court agreed with this at page 8 of the opinion, that the most effective dose of Roche's drug established prior to the filing date was 2.5 mg per day. That doesn't mean that 5 wouldn't work. Wasn't there some indication that 5 wouldn't work also? The drug caused a very large increase in the incidence of gastrointestinal side effects. Does the non-obvious invention have to be the best, an improvement over everything that went before? I think, Your Honor, the cases that deal with that particular issue, for example, enumerate Gurley, they focus on the fact that if you present evidence that, let's say the 5 mg dose would have been disfavored, that's still relevant to consider. But I think a determining factor would be, why was it where there's superior results achieved with the 150 mg dose, and would those have been expected? And this is why we focus on that particular legal error of the district court failing to consider that objective evidence. Is Roche selling 150 or 75? 150, Your Honor. I'm having a hard time understanding how you call this a legal error. I mean, the trial court specifically considered it but rejected it, said that it wasn't really, it wouldn't have been unexpected given the prior art. What the trial court ruled was that it would not have been unexpected to be safe and effective. However, the trial court based its conclusions on extrapolation from daily doses, and we have that 2.5 dose and the 5 dose where the 2.5 was really the best. 5 did not, increasing the dose or doubling the dose did not improve the efficacy of the drug. Therefore, in the normal course of development of these drugs, particularly with drugs that have gastrointestinal side effects like the bisphosphonates, the art uses the lowest effective dose of the drug. This was taught in the Schofield reference relied on by the district court in paragraph 30 of that reference to use the lowest effective dose, which would be 2.5 mg. The other clinical trial reference the court relied upon, the Reese reference, indeed used that 2.5 mg dose. And both Rabin and Reese, those two clinical trial references said that the 2.5 mg dose was the one that was going to be tested in phase 3 fracture reduction clinical trials. And as we pointed out in our briefs, Roche received FDA approval to market the 2.5 mg dose, so it markets the 2.5 and the 150. The reason that we say failure to consider the unexpected superiority raises a legal error is because of this court's precedence holding that all evidence of objective indicia of non-obviousness must be considered in every case. Well, it has to be considered. It doesn't mean you have to buy it, right? I mean, that's what I'm having trouble with now. Begin with the proposition that we're reviewing a district court at a PI stage, and then you look at the district court findings, and the district court specifically said that he considered all of that evidence but found it unpersuasive. Actually, it doesn't say he considered the evidence of unexpected superiority, Your Honor. You're referring to, I believe, his discussion at page 15 of the opinion. He doesn't say we pointed out what the magic bullet was, if you will, and that's what our unexpected superiority argument goes directly to, that when Roche began to develop the monthly dosing, they started from fracture reduction results that they had but weren't in the art with the 2.5 milligram dose and with an intermittent oral dose that averaged 80 milligrams a month. They had no reason to think they were going to exceed the best results they got, which were with the 2.5 milligram. They knew they wouldn't get better results with the 5. Mr. Wood, aside from the fact that you're suggesting that your client is selling an inferior product, Ravin says that the responses from 2.5 and 5.0 were not significantly different. Right. He said that. He said in the conclusion that the 2.5 was better, though, for bone mineral density. He also said in the conclusion that the 5 milligram dose had a higher incidence of gastrointestinal side effects. So, I think that the reason that the superiority of the 150 milligram dose is important is because there was no reason to expect to be able to exceed the performance of daily continuous administration of the best dose that was known in the art, 2.5 milligrams. Or, for that matter, the 5 milligram dose did not give you better results than 2.5. So, doubling the dose with daily continuous administration did not improve results. It increased the side effects by 64 percent. It resulted in women dropping out of the study because they could not tolerate the drug. And Judge Chesler did agree with us that the 2.5 milligram dose was superior. So, in developing monthly dosing, we're looking at a dosing regimen once monthly that had not been tried before in the prior art. There was one clinical trial we brought to the district court's attention concerning a Sanofi drug, Telogenate, that was tested in monthly dosing, but they divided the doses over seven days, giving it for the first week of the month with three weeks off. And that was a clinical trial failure, failed to reduce fracture risk. Is fracture risk an issue in this patent? Yes, because the patents are directed to treating or preventing osteoporosis. As we explained in the briefs, osteoporosis involves, in postmenopausal women, involves the bone remodeling cycle getting so out of balance that bone starts to deteriorate and break down and ultimately leads to risk of fracture. As a practical matter that may be true, but the claims relate to bone density, not fracture reduction. No, the bones don't mention bone density. The claims say treating or inhibiting postmenopausal osteoporosis. And to treat osteoporosis, the main goal in treating osteoporosis is to put women on these drugs chronically in order to reduce their risk of fracture. You're treating women who have probably already broken a back or a hip. You're putting them on these drugs to reduce the chance that they're going to break their backs again. And so it's critically important and there was testimony in the record about fracture risk reduction being required or essential at page 233 to 234 and 234 to 237. Indeed, in order to commercially develop a drug, the FDA at this time and still today required proof of fracture risk reduction in order to treat osteoporosis. And for prevention of osteoporosis as a prophylactic, it required to first establish that the drug would be successful in reducing fracture risk and then you could bridge to that. The first data available on Roche's drug that it would successfully reduce risk of fracture came after the filing date. It's based on a Roche clinical study that proved the 2.5 milligram dose worked continuously. It proved that there was significant fracture reduction with an intermittent oral dose, not the claimed invention, but an intermittent oral dose that was a quarterly administration where a divided oral dose was administered at the beginning. And it was based on that data known only to Roche that it was then able to go and develop the monthly invention. Up until the time Roche started to work on monthly dosing and it tested 100 and it tested 150 milligrams, the normal course of research in New York would have been to start with the lowest effective dose that was already established in Rabin and agreed with by the district court at page 8 of the opinion. I'd like to reserve a minute and a half if I may. Okay, we'll save you a little time, Mr. Waddell. Thank you, Dean Mazzocchi, on behalf of the defendants today. I'd first like to note that this court, prior to the oral argument today, had issued an order asking the parties to be prepared to talk about the district court's summary judgment opinion. Many of the arguments that Mr. Waddell raised here and in his brief where he said the district court didn't consider this issue and this would be outcome determinative to the obviousness analysis, the district court has in fact considered those issues. And he in fact ruled that the patent should be held invalid for summary judgment on obviousness grounds. He found that there was actually no material fact in dispute. Practically speaking, because of some other pending issues, the district court's order has not yet become final. But in all practical effect, with all due respect, this particular appellate proceeding is going to become moot quite shortly, if it's not practically moot already, because Judge Chesler has in fact invalidated the 634 patent. But the invalidation shouldn't really be material to our decision, he assures us. Well, I think that the minute he enters that final judgment order, there is a case from this court with Fundical, I apologize, I'm pronouncing it wrong, to the S.A., the United States, 841 F. 2nd, 1101 at 1103-04, Fed Circuit 1998, that basically said when the trial court has an intervening judgment on the merits, we dismiss the appeal as moot. But that's subject to appeal. And then that would be subject to appeal, I agree. And that, quite frankly, is the appropriate place where if Roche wants to continue to further challenge Judge Chesler's opinions, that's the appropriate vehicle to do that. Does the fact that there was a request for us to delay this appeal pending an assessment of the summary judgment work in your favor? To me, I quite frankly don't understand why Roche hasn't dismissed this appeal, knowing how Judge Chesler ruled. Before this court, Roche is suggesting that Judge Chesler erred in concluding that Roche was not likely to succeed on the merits. Judge Chesler has now ruled and concluded that the patent is invalid, so we know that Roche did not succeed on the merits. So, to me, I don't understand why Roche didn't dismiss this appeal. That's perhaps a better question for Mr. Waddell. There is a second patent, the 957 patent, that has not yet been held invalid formally. But here before this court, the only patent claim that Roche identified as the representative patent claim that was going to stand in for the invention for both patents was claim one of the 634 patents. And that's the patent claim that Judge Chesler has now held invalid. And that's what the PI was addressing, correct? Yeah, and in fact, Judge Chesler noted in his PI decision, he said, you didn't treat these two patent claims or the claims in these two patents differently, which he felt was very surprising. But he nevertheless said, all right, here's the three elements that Roche says are the key elements in its patent claims, and Roche has not disputed that here on appeal. And those are the claim elements that Judge Chesler has already found are invalid for obviousness. So I question whether at this stage there's really much for this court to do since Judge Chesler has ruled. Why hasn't that order become final? The only reason why it hasn't become final is after Judge Chesler issued the order for the 634 patent, he got the parties on the phone and said, all right, explain to me why my order does not apply to the 957 patent as well. Because again, that was never argued separately. And Roche requested an opportunity to brief to Judge Chesler. They basically wanted another bite at the apple to try to say, once again, here's why we think these claims are invalid. And they sent in a huge stack of paper, and he gave us the opportunity to respond. So it's currently sitting before us. So there's going to be some time before we have a final judgment on that. I don't know the exact. I can't predict what Judge Chesler is actually going to do. But for all intents and purposes, he has entered judgment on the merits for the 634 patent. So there's really nothing left to do in that case. The sole reason why that judgment hasn't become final is because it's mixed in with the 957 case. So let's assume that that doesn't exist and that you're limited to the record at the PI stage. Right. So you have to try to put out of your mind, as do we, I guess, anything that Judge Chesler said at the summary judgment stage. How do you respond to the argument that there were certain gaps, perhaps, in the trial judge's analysis at the preliminary injunction stage? Right. It's still not clear to me what they actually think was the error here. Because, obviously, in a preliminary injunction appeal, the abusive discretion standard is not justification for them to basically re-argue all of the same things that they put in front of the district court. The one key issue that Mr. Waddell was focusing on that he said the district court did not consider was their allegation that the 150 milligram dose was unexpectedly superior to the 2.5 milligram daily dosing. With all due respect, Roche has never put in any actual evidence that demonstrates that. In page 43 of their brief where they discuss this issue, they provide this court with a couple of citations to the record. The first citation that they give is A24834-836 on this particular issue. Those three pages are doing nothing more than citing back to Roche's own attorney argument in its motion for summary judgment opposition brief. If you actually go to those pages in the joint appendix, the only statement that Roche provides in support for this particular concept is they cite to there a paragraph 809 in their combined statement of opposition to the statement of material facts. That statement that they put in paragraph 809, they don't even put this before your honors to say here is the person in the prior art who said this is what we are going to expect. Here is a person who actually did look at the evidence and conclude, either in a literature source, a patent, or in expert testimony, that this is in fact an unexpected result. There is no actual evidence of that. While I can certainly respect that the district court, if actual evidence of unexpected results is put before him, the district court has an obligation to consider it, but I would actually like Mr. Waddell to specifically identify where this evidence is because with all due respect, the only evidence that is of record actually contradicts their theory. For example, in the appendix, let me find the exact page for you, their own expert, Dr. Russell, this is appendix page A20926, it had actually been reported that Graham Russell stated that he does not find it surprising, and he does not find it surprising that greater efficacy is seen with a 150 mg dose than the 2.5 mg dose as it far exceeds the total cumulative dose provided by the daily regimen. You're not saying that these results were so clear that they didn't have to be tested? No, I think that it was very clear from the total dose concept, which was established by the Reese paper, that the total cumulative dose that is given over a particular time interval is what can dictate therapeutic efficacy, and that was known and that was established with that paper. But they tested 100, 150, 200, why did all that work have to be done at the expense that accompanies clinical trials and all the rest of it if it was obvious, so crystal clear that this is what you should be doing? Because the FDA will not allow you to go to market without proof of clinical trials, that doesn't mean that the person of ordinary skill in the art who is working in this field wouldn't understand an appropriate dose. The FDA doesn't require you to repeat that which is already known, do they? Oh, I can assure you that if you tried to go to the FDA with merely Roshan's patent specification disclosure in this case and tried to say, please approve my drug based on what I've said here in the art that came before, there's no way that FDA would let you go on the market. But if there's no difference between 100 and 150, for instance, why doesn't your client just put the 100 through the FDA and that will be the end of it? I don't think that the, if you follow the total dose concept in fact, you would not select the 100 milligram dose because the total dose concept, when you look at the art as a whole, particularly back at the relevant time frame that we're looking at here, the total dose concept was actually driving people to select the 2.5, I'm sorry, not the 2.5 milligram daily dose as the base amount, but the 5 milligram dose as the base amount. Because while the Robin paper as it stood in 1996, you know, it did test two doses that it found to be statistically significant relative to placebo. Those two doses were the 2.5 milligram daily and the 5 milligram daily. Now, Mr. Waddell suggested that Robin says all these bad things about the 5 milligram daily dose. That in fact is not what the Robin paper says. The Robin paper in fact found that both of those doses were effective and statistically significant relative to placebo. And when it came to the side effects, the Robin paper in fact concluded, and this is at page A13397, it talks about the participants in the 2.5 milligram group and those who participated in the 5 milligram group, none of these adverse events were considered serious. None of the safety laboratory parameters, and then it lists a whole laundry list of them, showed trends or changes which differed from placebo in any clinically meaningful way. Then why doesn't the potential competitor use these other doses? Because if you're talking about today, the reason why, I mean aside from the fact that we're generic companies, but the reason why no one sees a need to go for some of these lower doses is based on what actually happened with some of the other drugs in this class. For example, risedronate, which is also in the aminobisphosphonate class with abandronate. Prior to the critical date, risedronate, Procter & Gamble did in fact test it at a 2.5 and a 5 milligram daily dose. And over time, they expressed some concern about the 2.5 milligram dose and said, you know what, we want to go with the 5 milligram dose because that's where we think we've got the better efficacy. Alendronate, the leading bisphosphonate in the market, the two daily doses that were selected for alendronate were 5 milligrams per day and 10 milligrams per day. So when it came to the three drugs that are routinely in this class linked together, abandronate, risedronate, and alendronate, the other two were, actually they had selected as their lowest dose the 5 milligram dose. And that 5 milligram dose, in fact, was the one that was then used as the basis for alendronate. Why are you not telling me that there's something special about this? I think that the ART does actually, when you look at the ART as a whole, the ART does in fact direct you towards the 5 milligram dose. The difodus reference that Judge Chesler referenced in his opinion, he in fact noted this, that in this difodus reference, when they were talking about the preferred dosing ranges for weekly abandronate, one of the doses that they identified was a 35 milligram abandronate dose, which if you apply the total dose concept, that's a 5 milligram per day dose. So while I understand why Mr. Waddell here wants to focus on just that one Rovin dose and what Roche itself did, when you look at the ART as a whole, there are actually multiple teachings that were guiding you towards the 5 milligram dose in preference to the 2.5 milligram dose. Moreover, Dr. Yates at the hearing in front of Judge Chesler, he actually testified, and his testimony was effectively unchallenged. He actually explained, and I believe that this is on page, let me find it for you, it is on page A362 in the appendix. He pointed out that if you looked at the Reece paper, in the Reece paper, by the one month mark, the patients had been given 20 milligrams per day every other day for a total accumulated dose of 240 milligrams. You then had at the end of the month patients who had been given only 75 milligrams over the course of the month. He said when you looked at that 240 milligram data, you saw much better results with the patients who had had that larger dose in comparison to the ones who had had the 75 milligram dose. And what that signals to you is that you are not at the top of the dose response curve if you rely on just that 2.5 milligram dose. So, quite the contrary, the ART, in fact, was not teaching towards the 2.5 milligram dose. There were very serious reasons that would have caused the person of ordinary skill in the ART to avoid the 2.5 milligram dose. But in the end, I think that from the perspective of the obviousness analysis, it really doesn't matter here because what you had, even if you rely on just the Robin dose, you had Robin saying the 2.5 milligram daily dose and the 5 milligram daily dose are both good doses. They're producing statistically significant results relative to placebo. And if you apply either dose in the total dose concept, it's our position that you get two obvious doses, 75 milligrams once a month and 150 milligrams once a month. And if what you're doing is you're following the teaching and suggestion and motivations in the ART, particularly if it's dictated by the total dose concept, you don't have an unexpected result to select a 150 milligram result. That is, in fact, where the ART is taking you. So, you know, and again, much of this testimony was in front of Judge Shedler. He heard our arguments. He heard their arguments. And Judge Shedler did come to the conclusion that he reached, and to the extent Roche wants to argue about the merits of a particular ART reference, Roche has not demonstrated clear error because this is not a legal error. It's a debate, and under the abuse of discretion standard, they don't really rise here to show the display of error. Thank you. Mr. Waddell. Thank you, Your Honor. Just to briefly address two points. Actually, I would like you first to address the point that counsel made because we went through that, and while I always find it entertaining when counsel cites to themselves, everything you cited to in the appendix was back to yourself, to your own arguments. So where is the evidence or testimony in the record that shows that these results were really so unexpected? Right. Thank you for giving me a chance to explain that. We cited to the record from pages 14 to 15 of her blue brief, citing to the expert declaration of Anastasia Dipotis at appendix reference 38-127 to 135. And what she explained there was that the reason that the superior efficacy at 150 milligrams was so unexpected was because of a property of Avanginate that was not known in the prior art. It wasn't even known to Roche before they started experimenting with it. It's an issue that I didn't get into today, frankly, because it's so technically dense, but it involves the concept of arithmetic extrapolation from a daily dose to a monthly dose. Assume that, and something you need to know about bisphosphonates is that when administered orally, they are very poorly absorbed. Less than 1% drug gets in. You take an oral dose, it's like a stone going through the body. Very little gets absorbed. If you're going to assume that you can do arithmetic extrapolation to a monthly dose 30 times that, then you have to make an assumption about whether that percentage, small percentage absorption, remains constant or linear as the dose is increased. What Roche found after they started experimenting with monthly dosing was that linearity only extended up to 50 milligrams. Merck's drug, Alendronate, it only extends up to 80. But in Roche's case, up to 50. When you start increasing the dose above 50, and particularly when you get to 150 milligrams, the actual absorption of the drug is super proportional. It's much more than you would have expected just from multiplying 30 times a 5 milligram dose. This is covered in the absorption characteristics unknown is at page 38-127 in paragraph 107. The disproportionate increase in serum levels is covered on the succeeding pages of the Diphotis Declaration. She, in turn, refers to clinical trial data that was submitted to the FDA. The actual evidence is there. Defendants did note in their opposition brief that they had moved to strike that evidence and prevent Roche from relying on it. The district court decided two weeks ago to reject defendants' motion and allow Roche to rely on that evidence. And it's that non-linear absorption evidence that really establishes why, in very objective terms, why you could not have expected superior results with a 150 milligram dose because there would have been no basis to expect that increasing the dose to 150 would also increase the absorption rate of the drug. That wasn't known in the art and that's very clearly covered in the Diphotis Declaration that was submitted in the appendix here and also called to the attention of the district court in our briefing. Last, on the issue of the summary judgment, there are two patents in suit. We're here only focused on the preliminary injunction decision and the court's rationale, but we did have oral arguments subsequent to the appeal briefing. In Judge Chesler's summary judgment decision, he has withdrawn his reliance on the Scopefield reference. He's now relying on a different combination and an obvious Detroit analysis. He still has not considered our evidence of unexpected superiority of the 150 milligram monthly dose. We have briefed for the district court whether summary judgment should be applied to the other patent in suit, the 957 patent, and we've fully briefed all these issues. We've also fully briefed a new issue Judge Chesler raised in his summary judgment decision. The parties had not addressed why fracture reduction efficacy, getting to your question, Judge O'Malley. Why does fracture reduction efficacy, why is that relevant to the claims to treating osteoporosis? And we explained that we did not brief that in a claim construction hearing because the parties had submitted a joint statement agreeing to a definition of osteoporosis that included that the disease includes an increased risk of fracture. So we have extensive briefing before the court now on a claim construction issue on the relevance of fracture reduction efficacy, and I think that may explain partly why the district court has not entered final judgment here and is still considering the issues in the case. Is this where you are, just awaiting the final judgment, or are you awaiting anything on summary judgment? We're awaiting a decision on both summary judgment as to the 957 patent and the judge's reconsideration of the question of whether fracture reduction efficacy should be looked at in the summary judgment context because, remember, Judge Chesler stated at page 13 of the PI opinion that he saw evidence of some uncertainties in the field. On summary judgment, he recognized that there was a lot of uncertainty about, or at least disputed evidence about, whether fracture reduction could have been reasonably predicted. But he decided that that evidence need not be looked at because, in his 634 opinion, he did not understand why fracture reduction was necessary for the treatment of osteoporosis, again, because the parties had not briefed it in claim construction. So we briefed that issue. Was your motion to delay this hearing and to combine it with any appeal of the summary judgment determination, isn't that essentially a concession by you that imminency of harm is not really as much of an issue as you might have originally thought when you thought up the act? No, Your Honor, it's really more practical than that. When we had a telephone conference with the district court judge, we thought he was in a hurry to enter summary judgment on the 957 patent and close the case out, and we thought by now we would have been appealing from entry of final judgment. Apparently, we've raised some issues in the supplemental briefing that have given the court something to think about. Well, do you think we should be ruling on this appeal, or should we hold it, depending further? What I ask is that the court rule on whether it is necessary for the district court to consider the evidence of unexpected superiority of that magic bullet 150 mg dose. Because, again, at page 15 in the PI opinion, the judge only refers to the other argument of it would have not been expected or it was unexpected that that dose would be safe and effective. That's a different argument from it was unexpected that it was actually going to be superior to the best dose of this drug that was known in the art prior to the filing date. Whether you look at the 2.5 or 5... We don't really need to get into the merits, but let me ask, Ms. Oakey, is there anything you need to tell us on this final issue that we raised yesterday to make sure we have both views? Yes, three things, Your Honor. First, nobody knows why Judge Chesler hasn't entered a ruling yet. He's a district court judge. He is very busy. He has a very heavy docket, so I wouldn't necessarily read into that. Second of all, I'd like to point out that in Judge Chesler's summary judgment opinion, and, in fact, in the preliminary injunction papers and the citations that Roche cites in its brief here, they did not put those paragraphs of the difodus declaration in front of Judge Chesler during the preliminary injunction hearing. And when it came to the summary judgment hearing, Judge Chesler specifically says that page 40 of his ruling, at oral argument, Roche raised the contention that the nonlinear bioavailability of abandronate was an unexpected result. What are you reading from? This is page 40 of Judge Chesler's summary judgment opinion, because Roche didn't put it in the preliminary injunction papers. Is this the only time you can remember where, as an appellee, you've had the final argument? I just wanted to be sure that we had enough of a balance to know what's before us and what isn't. Yes, I understand. But I just want to say, he said the theory was not raised in Roche's opposition brief, and the new argument will not be considered. With all due respect, if this was the key thing that they wanted Judge Chesler to rely on... I think we don't need the argument. We just need to be sure that we know as well as we can what's before us to decide. That's fine. And then I would like to just call, with regard to the fracture issue... Well, we've heard about fractures. Okay. Record site A, 283. That's all I just wanted to point the court to. Thank you very much. Okay. All right. I think we know as well as we can what's before us. The case is taken under submission. Thank you both. All rise.